**FILED**

**MAY 2 2 2017**

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 17-mj-217-DAR-BAH |
| Plaintiff, | 17-mj-218-DAR-BAH |
| | 17-mj-219-DAR-BAH |
| v. | 17-mj-220-DAR-BAH |
| | 17-mj-221-DAR-BAH |
| ALL WIRE TRANSACTIONS INVOLVING | 17-mj-222-DAR-BAH |
| DANDONG ZHICHENG METALLIC | 17-mj-223-DAR-BAH |
| MATERIAL COMPANY, LTD., *et al.*, | 17-mj-224-DAR-BAH |
| Defendant. | **UNDER SEAL** |

## MEMORANDUM AND ORDER

The United States government has filed objections to the Magistrate Judge's orders,

issued on May 2, 2017, denying eight applications for so-called "damming" seizure warrants "for

all funds at eight U.S. financial institutions, which, according to grand jury subpoena returns

from those institutions, have processed over $700 million of prohibited transactions with a set of

entities with links to North Korea." Gov't's Obj. Mag. Judge's Order Denying Gov't's

Requested Seizure Warrants ("Gov't's Obj.") at 2, ECF No. 12.[1] As the government puts it, "[a]

damming seizure warrant places a metaphorical dam at the financial institution in question to

catch all incoming funds during the 14-day time period of the warrant, while preventing any

funds from exiting the financial institution." *Id.*[2] For the reasons set out below, the Magistrate

---

[1]    Each application is supported by the same affidavit, and the Magistrate Judge issued identical orders with
respect to each application. Accordingly, this Memorandum and Order, which addresses collectively the eight
applications and orders, will be docketed in all eight cases.

[2]    Here, the government requests that warrants contain the following language:

> For a period of 14 days (including weekends) after the date of issuance of this warrant,
> the financial institution shall seize all transactions for the subject parties named below
> ("subject parties"), regardless of whether the subject parties are the originating or

Judge's May 2, 2017 orders are vacated, and the government's applications for eight seizure warrants are granted.

## I.  BACKGROUND

The government filed eight applications for damming seizure warrants, pursuant to Federal Rule of Criminal Procedure 41, on April 12, 2017.  *See generally id.*, Ex. A.  The applications sought warrants authorizing the capture of all funds into and out of correspondent bank accounts belonging to Dandong Zhicheng Metallic Material Co., Ltd. and four related front companies (referred to as "the Chi Yupeng Network," after the name of the individual who owns 90 percent of Dandong Zhicheng's shares), which allegedly purchase coal from North Korea with U.S. currency using various obfuscation tactics.  *See id.*, Ex. C-2 ¶¶ 5–7, 60–75.  According to the affidavit supporting the eight warrant applications here, "[t]he front companies engage in these transactions in support of purchases ultimately benefitting sanctioned North Korean end users, including the North Korea military and North Korea weapons programs."  *Id.* ¶ 47; *accord id.* ¶ 78 (noting that, according to a North Korea defector deemed to be reliable, "Kim Jong-un puts over 95% of North Korea's foreign currency earnings generated from coal exports toward

---

beneficiary party.  The financial institution shall not reject or deny transactions by the subject parties during this time period.

Specifically the financial institution is to continue to process all transactions for the subject parties, including deposits, interest, dividends, and wires in, including those via correspondent banking transactions.

For this 14-day period, the financial institution **shall not** process any debit transactions or wires out, including for correspondent banking transactions for the subject parties.

All correspondent banking transactions by the subject parties shall be frozen immediately upon receipt of the funds by the financial institution.

Following the expiration of the 14-day period, the financial institution shall immediately effect the seizure of any property collected during this time period via the above directives, and provide such property to a designated law enforcement officer.

the advancement of . . . North Korea's military and North Korea's nuclear missiles and weapons programs."). The eight warrant applications sought "target funds originating at offshore U.S. dollar accounts that are routed through correspondent accounts maintained at . . . eight correspondent banks in the United States, all of which have been used to route the [t]arget [f]unds." *Id.* ¶ 8. "According to subpoena returns from [the eight] banks, [they] have transacted over $20 million for the Chi Yupeng Network . . . between 2009 and the present date." *Id.*

The following day, April 13, 2017, the Magistrate Judge issued an order directing the government to answer nine questions about the applications and accompanying affidavit. *See generally id.*, Ex. B. The government filed a supplemental affidavit the next day addressing each of the Magistrate Judge's questions. *See generally id.*, Ex. C-1. At the direction of the Magistrate Judge, the government refiled its original application with the answers to the Magistrate Judge's nine questions incorporated into that affidavit. *See generally id.*, Ex. C-2.

That same day, the Magistrate Judge directed the government to file, by April 20, 2017, a memorandum of law more fully addressing two of the nine questions previously posed to the government regarding the applicability of the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(I), and the North Korea Sanctions and Policy Enhancement Act of 2016 (NKSPEA), 22 U.S.C. §§ 9201 *et seq.*, for the issuance of the seizure warrants. *See id.*, Ex. D. at 1. Later that day, the government tendered to the Clerk's Office amended warrant applications and a second amended affidavit that excised one of the legal theories proffered to support issuance of the warrants. *See id.*, Ex. E ¶ 6 ("The amended application and affidavit excised all references to 18 U.S.C. § 981(a)(1)(I) and NKSPEA. Section 981(a)(1)(I) was one theory pled . . . [and] the government still have [sic] multiple theories of forfeiture to rely upon."). The Magistrate Judge denied the government's amended applications. *See id.* at 1–2, Ex. F (admonishing the government for

3

simply "excising" a theory and finding no "legal basis for issuance of a warrant" (emphasis omitted)).

On April 19, 2017, the government filed a memorandum of law supplementing its prior responses to the Magistrate Judge's two questions about 18 U.S.C. § 981(a)(1)(I) and NKSPEA. *See generally id.*, Ex. G. Thereafter, the Magistrate Judge directed the government to brief three additional questions regarding the Court's jurisdiction to issue the warrants. *See generally id.*, Ex. H. After the government filed a response, *see generally id.*, Ex. I, the Magistrate Judge issued orders, on May 2, 2017, denying the warrant applications, finding that the warrants are not proper under Federal Rule of Criminal Procedure 41 and that "no authority ha[d] been offered for the issuance of 'damming warrants,'" *id.*, Ex. J at 4. Pending before the Court is the government's objection, filed on May 16, 2017, to the Magistrate Judge's denial order that seeks *vacatur* of the denial order and "grant of the government's renewed applications for the Eight Seizure Warrants." *Id.* at 3.

## II.    LEGAL STANDARD

A magistrate judge's power to adjudicate warrant applications derives from the Federal Magistrates Act, 28 U.S.C. §§ 631–639, which vests magistrate judges with authority to decide certain pre-trial matters, including whether to grant warrant applications. *Id.* § 636(b)(1)(A). A district judge "may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Id.* Accordingly, the Magistrate Judge's denial of the government's applications for a seizure warrant will be reviewed to determine whether it is clearly erroneous or contrary to the law. *See Matter of Search of Info. Associated with [redacted]@mac.com Stored at Premises Controlled*

*by Apple, Inc.*, 13 F. Supp. 3d 157, 162 (D.D.C. 2014) (applying the same standard in reviewing a magistrate judge's denial of a search warrant).

## III.   DISCUSSION

Under Federal Rule of Criminal Procedure 41, "a magistrate judge . . . must issue [a] warrant if there is probable cause to search for and seize a person or property . . . ." FED. R. CRIM. P. 41(d)(1).  Here, the Magistrate Judge ruled that this Court lacks authority to issue a damming warrant pursuant to Rule 41 both because such warrants are not contemplated by statute or rule and because "[t]he funds which are the subject of the applications are not currently located in the United States, nor are they located in an interbank account and sought pursuant to 18 U.S.C. § 981(k)."  Gov't's Obj., Ex. J at 4.  The government argues that this ruling is contrary to law, and that the government has established probable cause sufficient for issuance of the warrants sought.  Gov't's Obj. at 4–9.  The government is correct on both points.

### A.   Legal Authority to Issue Damming Seizure Warrants

Acknowledging the "dearth of case law speaking directly to damming warrants," the government explains that such warrants are indeed "common practice in most federal districts, including this one."  *Id.* at 11.[3]  The government argues that damming seizure warrants "are independently authorized as: (1) anticipatory seizure warrants, which are preferable to warrantless seizures based on exigent circumstances; (2) prospective seizure warrants, similar to surveillance warrants that collect cell-site location data; and (3) a traditional seizure warrant that occurs over 14 days via a single warrant pursuant to the reasonable continuation doctrine."  *Id.*

---

[3]     The government notes that, in one recent case in this Court, the government was successful in recovering additional tainted funds due to damming language in a seizure warrant. *See id.* at 11–12 (citing *United States v. Bikundi*, 125 F. Supp. 3d 178, 180 (D.D.C. 2015)).  The government also cites a case from another district court that mentions the issuance of damming warrants. *See United States v. Any & All Funds on Deposit in Account No. 0139874788, at Regions Bank, held in the name of Efans Trading Corp.*, 36 ITRD 1394, *3 (S.D.N.Y. 2015) (unreported).

Courts, however, do not appear to differentiate between "anticipatory" and "prospective"

warrants. *See, e.g.*, *United States v. Ruddell*, 71 F.3d 331, 333 (9th Cir. 1995) (stating that the

defendant argued that a search warrant "was an unconstitutional anticipatory or prospective

warrant"). "Anticipatory warrants differ from other search warrants in that they are not

supported by probable cause to believe that contraband exists at the premises to be searched at

the time they are issued," *United States v. Dennis*, 115 F.3d 524, 528 (7th Cir. 1997), but rather

at the time of execution.

The Supreme Court addressed the propriety of anticipatory warrants pursuant to Rule 41

in *United States v. Grubbs*, 547 U.S. 90 (2006); *see also United States v. N.Y. Tel. Co.*, 434 U.S.

159 (1977) (affirming the district court's issuance of a warrant authorizing the collection of pen

register information on a prospective basis under both Rule 41 and the All Writs Act). In

*Grubbs*, the defendant had ordered a videotape containing child pornography from a website

administered by an undercover postal inspector. *Id.* at 92. Law enforcement officers arranged a

controlled delivery of the videotape to the defendant's home, and a postal inspector filed a search

warrant application with a magistrate judge, accompanied by an affidavit, which stated,

"Execution of this search warrant will not occur unless and until the parcel has been received by

a person(s) and has been physically taken into the residence . . . . At that time, and not before,

this search warrant will be executed by me and other United States Postal inspectors, with

appropriate assistance from other law enforcement officers." *Id.* The magistrate judge issued the

requested warrant. *Id.* at 93. Thereafter, an undercover postal inspector delivered the video to

the defendant's home and the defendant's wife accepted the package, at which point law

enforcement entered and searched the home. *Id.* The defendant moved to suppress the evidence

seized during the search of his home following his indictment on one count of receiving child

6

pornography. *Id.* The district court denied the motion, and the defendant pleaded guilty but reserved the right to appeal the denial of the suppression motion. *Id.*

The case ultimately reached the Supreme Court, which addressed, *inter alia*, "the question whether anticipatory search warrants are categorically unconstitutional." *Id.* at 94. The Court began its analysis by defining an anticipatory search warrant as "'a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of a crime will be located at a specific place.'" *Id.* (quoting 2 W. LaFave, Search and Seizure § 3.7(c), p. 398 (4th ed. 2004)); *see also id.* at 95 (making the commonsense observation that "[b]ecause the probable-cause requirement looks to whether evidence will be found *when the search [or seizure] is conducted*, all warrants are, in a sense, anticipatory" (emphasis in original)). The Court further noted that "[m]ost anticipatory warrants subject their execution to some condition precedent other than the mere passage of time—a co-called 'triggering condition.'" *Id.* at 94. In *Grubbs*, the triggering condition was the acceptance of the package containing the pornographic video delivered by the undercover postal inspector. *Id.*

The Court roundly rejected the petitioner's argument that anticipatory warrants are *per se* unlawful. *Id.* at 95 ("We reject [the petitioner's] view, as has every Court of Appeals to confront the issue."). Instead, the Court explained that, unlike more conventional warrants, anticipatory warrants require *two* probable cause showings: "[i]t must first be true not only that *if* the triggering condition occurs, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' but also that there is probable cause to believe the triggering condition *will occur*." *Id.* at 96–97 (emphasis in original) (quoting *Gates* 462 U.S. at 238); *accord, e.g., United States v. Garcia*, 882 F.2d 669, 702 (2d Cir. 1989) ("[T]he fact that the contraband is not presently located at the place described in the warrant is immaterial, so long as

7

there is probable cause to believe that it will be there when the search warrant is executed."). Put differently, to issue an anticipatory warrant, a judge must determine "(1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive, *will be* on the described premises (3) when the warrant is executed." *Grubbs*, 547 U.S. at 96 (emphasis in original). Applied to the forfeiture context, *Grubbs* makes clear that seizure warrants may authorize the seizure of items (or funds) not then present so long as there is probable cause to believe both that the items will later be present and that a crime for which forfeiture is appropriate has occurred (*i.e.*, that the items or funds will be subject to forfeiture). *Cf. U.S. v. $490,920 in U.S. Currency*, 937 F. Supp. 249, 253 (S.D.N.Y. 1996) (issuing a seizure warrant "in anticipation of the time when the [relevant funds] [are] available for arrest or seizure"). Thus, damming seizure warrants are plainly authorized under *Grubbs* and the authority on which it is predicated. Consequently, the Magistrate Judge's contrary determination is contrary to law. *See* 28 U.S.C. § 636(b)(1)(A).[4]

## B.     The Warrants Are Supported by Probable Cause

The Magistrate Judge did not reach the question whether the affidavit supporting the eight warrant applications establishes probable cause. *See id.*, Ex. J at 4 n.2 (questioning whether the government's affidavit "satisfied the Rule 41 probable cause standard" but stating that there was "no occasion" to make such a determination given the lack of authority to issue a damming warrant). "The determination of probable cause calls for a 'practical, commonsense' inquiry," *United States v. Warren*, 42 F.3d 647, 652 (D.C. Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)), and, as such, "is not reducible to precise definition or quantification,"

---

[4]     Not only does this Court have authority to issue a damming seizure warrant, venue is also plainly proper in this Court. Under Federal Rule of Criminal Procedure 41(b)(5), a warrant may issue "in any district where activities related to the crime may have occurred, or in the District of Columbia," and both independent conditions obtain here. *See* Gov't's Obj., Ex. C-2 ¶ 89 (describing "suspicious transactions" on behalf of North Korea in 2016 by two companies within the Chi Yupeng Network with a company "based" in this district).

*Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013). "A judicial officer who is considering an application for a search warrant must decide 'whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238 (1983)).

In this case, the government's affidavit amply establishes probable cause to believe that the triggering event—the attempted deposit or withdrawal of funds into the bank accounts at issue—will occur, as well as probable cause to believe that if such triggering event occurs, funds subject to forfeiture will be present in the relevant account. As to the triggering event, the government's affidavit explains that "the [t]arget [f]unds will continue to flow through the eight U.S. based bank's [sic] correspondent accounts," noting that "these banks individually have each processed more than $20 million for the Chi Yupeng Network," have "collectively processed more than $700 million from January 2009 to the present," and have "collectively processed more than $52 million in the past seven months." Gov't's Obj., Ex. C-2 ¶ 189. On these facts, there is probable cause to believe that additional funds will flow into accounts associated with the Chi Yupeng Network in the next 14 days. *See United States v. Yusuf*, 461 F.3d 374, 397 (3d Cir. 2006) ("The circumstances surrounding the large-scale currency deposits . . . clearly provided probable cause to search for corporate business records at the Plaza Extra locations, *particularly given the historical link of similar past activity at the Plaza Extra stores, as well as . . . recent suspect offshore deposits made by the principal defendant*." (emphasis added)).

As for probable cause to believe that a crime warranting forfeiture of the target funds has occurred, the affidavit, relying on multiple sources, including two North Korean defectors, who corroborate each other, describes in 80 pages of detail how the Chi Yupeng Network engages in

transactions designed to conceal the true origin and destination of funds that are being routed through U.S. correspondent banks. *Id.* ¶¶ 60–75. These particular transactions are consistent with generalized patterns of North Korean money laundering identified by the defectors and other sources. *See id.* ¶¶ 39–59; ¶¶ 165–71 (describing "layering" transactions). The affidavit catalogues numerous transactions between the Chi Yupeng Network with other entities known to conduct business with or on behalf of North Korea. *Id.* ¶¶ 94–127. Additionally, the affidavit explains that the majority owner and the manager of Dandong Zhecheng, the main company associated with the Chi Yupeng Network, utilize U.S. dollar accounts in the names of their employees and at least one relative to effectuate large wire transfers. *See id.* ¶¶ 172–82. Thus, the affidavit establishes probable cause to believe that funds routed through U.S. correspondent banks by the Chi Yupeng Network are subject to forfeiture as violative of the money laundering statute, 28 U.S.C. § 1956(c)(7)(A) and (D), the International Emergency Economic Powers Act, 50 U.S.C. § 1705(a), and the NKSPEA.[5] In sum, then, the affidavit establishes probable cause as to both the triggering event and forfeiture itself, as required under *Grubbs* to issue the damming seizure warrants sought here.[6]

## IV.    CONCLUSION

For the reasons set out above, it is hereby

---

[5]      As to the NKSPEA, the government posits that 18 U.S.C. § 981(a)(1)(I) authorizes forfeiture of "[a]ny property, real or personal, that is involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed pursuant to section 104(a) of [NKSPEA]." Section 104(a) of the NKSPEA, in turn, prohibits "engag[ing] in money laundering . . . that supports the Government of North Korea," 22 U.S.C. § 9214(a)(6), and "sell[ing], suppl[ying], or transfer[ing] to or from the Government of North Korea . . . a significant amount of precious metal, graphite, raw or semi-finished metals or aluminum, steel, coal, or software," *id.* § 9214(a)(8). The totality of the facts set out in the affidavit supporting the warrant applications shows probable cause to believe that the Chi Yupeng Network has and is continuing to engage in violations of the NKSPEA through use of wire transfers of U.S. currency at the eight U.S. financial institutions named as recipients of the warrants. *See* Gov't's Obj., Ex. G at 6.

[6]      Having concluded that damming seizure warrants are authorized as anticipatory warrants, the Court need not address the government's alternative asserted basis for damming seizure warrants, *i.e.*, that they are permissible under the reasonable continuation doctrine.

**ORDERED** that the Magistrate Judge's orders denying the government's eight damming seizure warrant applications are VACATED; and it is further

**ORDERED** that the eight warrant applications are GRANTED; and it is further

**ORDERED** that the United States Attorney's Office shall, by June 30, 2017, review this Memorandum and Order and propose any portions that may be partially unsealed for filing on the public docket.

**SO ORDERED.**

Date: May 22, 2017

BERYL A. HOWELL
Chief Judge